[No. H008411. Sixth Dist. Apr. 23, 1992.]

In re JOHN V. et al., Persons Coming Under the Juvenile Court Law.
SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND
CHILDREN'S SERVICES, Plaintiff and Respondent, v.
JUANITA W., Defendant and Appellant.

[No. H008929. Sixth Dist. Apr. 23, 1992.]

JUANITA W., Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND
CHILDREN'S SERVICES, Real Party in Interest.

## Counsel

Ann Jory, under appointment by the Court of Appeal, for Defendant and Appellant and for Petitioner.

Steven M. Woodside, County Counsel, and Jeffrey L. Bryson, Deputy County Counsel, for Plaintiff and Respondent and for Real Party in Interest.

No appearance for Respondent Superior Court.

George W. Kennedy, Distict Attorney, and Robert J. Masterson, Deputy District Attorney, for Minors.

## Opinion

ELIA, J.—Juanita W. (appellant) is the mother of four children. Three of them, Steve W., Jr., John V., and Sophia V., are dependents of the juvenile court. In appeal No. H008411, and in petition for a writ of mandate and/or prohibition, No. H008929, she challenges a juvenile court order terminating reunification services and scheduling a permanency planning hearing as to these three children, and finding Steve, Jr., adoptable. We ordered the appeal and the writ considered together. Since appellant requested writ review after her parental rights to Steve, Jr. were terminated, we will dismiss the writ petition. Although we agree that the juvenile court improperly proceeded as to John and Sophia, it appears that this error was subsequently corrected. Since we find no other error, we will affirm the juvenile court's order.

### Factual and Procedural Background

John V. was born in 1977, Sophia V. was born in 1980, and Steve W., Jr., was born in 1983. A fourth child, Danny V., was born in 1978. His dependency status is not at issue in this writ and appeal.

### Appeal No. H008411

As to John and Sophia, the underlying facts are these: At the time John and Sophia were first taken into protective custody in March 1988, they were living with their father, Paul V., who is not a party to this appeal or writ. School officials called police when no one picked up John after school one day; when they took him home, police found Sophia alone, outside their locked residence. Appellant's whereabouts were unknown at this time.

A petition alleging that John came under the provisions of Welfare and Institutions Code section 300, subdivision (a)[1] was filed on March 7, 1988. A similar petition as to Sophia was filed on March 10. Both petitions alleged that the children had no permanent place of abode, moved from one temporary residence to another, frequently missed school, were not provided lunch, and were unclean and inappropriately dressed.

On April 14, 1988, at a combined jurisdiction and disposition hearing, John and Sophia were adjudicated dependents of the juvenile court. The children were first returned to the custody of their paternal grandmother, but were placed in foster care after she became ill in July. In April, appellant made contact with respondent, expressing interest in reunifying with her children. She was referred for testing and a parenting program.

Appellant visited several times with John and Sophia after they ceased to live with their grandmother. The visits were mutually enjoyable. At this point, both parents were requesting custody of the two children. Father was out of work as a result of an accident, but his wife, the children's stepmother, was considered capable and caring. Appellant was considered unstable. She was employed as a nurse's aide, but had no permanent housing. In the report prepared for the six-month review hearing, respondent recommended the children be returned to their father's custody.

On September 28, 1989, at the six-month review hearing, the juvenile court ordered the children returned to their father's custody, on condition he reside with the children's paternal grandmother.

On January 31, 1989, a section 387 supplemental petition was filed, requesting a modification of the juvenile court's order. The petition stated that on January 9, 1989, father had left grandmother's house in violation of the juvenile court's previous order, that his current whereabouts were unknown, and that the paternal grandmother could not continue caring for the children. The children were ordered placed in the children's shelter.

On February 28, 1989, a 12-month review hearing was held. Two notices of this hearing referred to it as a "jurisdictional" hearing. A subsequent notice referred to it as a "Permanency Planning" hearing.

On March 1, 1989, the juvenile court sustained the section 387 petition, finding, inter alia, that the previous disposition had not been effective in protecting the children, and awarding their care and custody to respondent

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

for foster placement. The court ordered the father to have "no contact" with John and Sophia.

An 18-month review hearing, originally scheduled for August 4, was continued to November 14, 1989. Previous orders remained unchanged. The report prepared for this hearing noted that both John and Sophia had said they wanted to live with their mother. Although appellant had previously been allowed weekend visits with the children, they had been ended when Steve was molested by his father, with whom appellant was then living (see *post*). Appellant's reunification plan continued to require her to obtain suitable housing and employment, to visit weekly and to participate in family counseling at the social worker's discretion. Appellant continued to insist that she did not need counseling. She continued to be unable to save or budget her meager income.

An evaluation of appellant prepared by Dr. Bruce Bess, a clinical psychologist, and dated June 16, 1989, noted it was "questionable . . . whether Ms. W[.] will be able to establish [a sufficient] degree of self-reliance or independence. She has been plagued by a lifelong conflict between unresolved dependency needs (needs to be taken care of) and resentment of people who exert control over her." This, he concluded, had resulted in a pattern of destructive, unstable relationships with men. As to both parents, he also concluded that they exhibited "characterological traits which have previously resulted in aberrant or dysfunctional behavior and could undermine their functioning in the future. Ms. W[.]'s dependency traits have in the past prevented her from providing adequate care or protection for her children and are liable to undermine her parenting in the future." Dr. Bess also suggested that because of her problems, appellant would have difficulty in setting limits as a parent.

A permanency planning hearing was originally scheduled for April 10, 1990. A report, dated May 24, 1990, was prepared for this hearing, which it denoted a "Twelve-Month Review of Dependency Status . . . ." The report noted that appellant's visitation had been erratic, that she had recently engaged in family counseling, and that she had changed jobs six times since the last report. She had also changed her residence six times, and continued to demonstrate an inability to budget or allocate money appropriately.

The "contested permanency planning hearing" was continued from May 24, 1990, to February 27, 1991. The hearing was eventually heard over three days, commencing on February 27 and ending on March 1, 1991. In the interim, John V. was returned from foster placement to the children's shelter on June 22, and placed in a different foster home on October 3, 1990.

The report prepared for this hearing noted that appellant's unstable life-style had persisted, despite referrals for housing assistance, that her hours of employment had changed five times between May 1990 and February 1991, that she had moved twice in the preceding six months, and that she had failed to become involved in counseling.

It appears that the juvenile court initially considered the February 27-March 1 hearing to be an 18-month review hearing as to John and Sophia. At the conclusion of the hearing, however, county counsel argued that the court should terminate reunification under section 366.21 and schedule a section 366.26 hearing. Later, county counsel corrected itself, stating that the hearing was a section 366.22 hearing. The juvenile court then terminated reunification efforts, and noting that a long-term plan of foster care was recommended for John and Sophia, scheduled a section 366.26 hearing for June 1991. This appeal ensued.

On appellant's request, we took judicial notice of a partial transcript of the subsequent hearing, held on July 26, 1991. It appears from this transcript that county counsel acknowledged the juvenile court had proceeded incorrectly in the previous hearing in applying the law applicable to minors adjudicated dependents after 1989 to John and Sophia. It suggested that at the previous hearing, the court should have adopted a plan of long-term foster care for them, and that it had made a mistake in setting a section 366.26 hearing. It then asked the court to "clean this up and to make the permanent plan of long-term foster care." At the conclusion of the hearing, the court adopted recommended orders including one that long-term foster care be the permanent plan for the minors.

### Writ Petition No. H008929

As to Steve, Jr., the underlying facts are these: On April 1, 1989, while in the care of appellant and his father, Steve W., Steve, Jr., was taken into protective custody based on appellant's allegations that the child was being subjected to excessive discipline by Steve W. (who is not a party to this writ or to the appeal), and to extreme conflict between the parents, including threats of physical violence.

On April 25, 1989, a petition was filed alleging that Steve, Jr., came under the provisions of section 300, subdivisions (a), (c), (d), and (j).

After several delays related to the establishment of Steve W.'s paternity, a jurisdiction and disposition hearing was held on September 27, 1989. Further disposition was continued to November 14, 1989. The report prepared for

the disposition hearing notes appellant's history of instability, and that Steve W. not only had a record of prior violent crime convictions but was also a registered sex offender. Steve, Jr., was examined for evidence of sexual molestation, and evidence of anal trauma was found.

At the continued dispositional hearing, Steve, Jr., was adjudicated a dependent and his placement in foster care was continued.

A permanency planning hearing scheduled for April 10, 1990 was continued to February 27, 1991, where it was combined with the alleged section 366.22 hearing for John and Sophia. As to Steve, this hearing was correctly denoted a section 366.21, 12-month review. At this hearing, Steve, Jr., testified in chambers out of the presence of his parents. At the conclusion of the hearing, the court found Steve, Jr., adoptable and scheduled a section 366.26 hearing.

*Discussion*

I. *Appeal No. H008411*

Appellant's arguments in this appeal can be encompassed in four general categories: Procedure, adequacy of reunification, adequacy of evidence of detriment to justify the failure to return the children to her custody, and applicability of the Indian Child Welfare Act. We will discuss these contentions seriatim.

A. *Procedure*

John and Sophia were adjudicated dependents of the juvenile court in April 1988. At the February 1991 hearing, county counsel requested findings which would have been required in a section 366.22, 18-month review, apparently assuming, as did the court, that the statutes pertaining to children adjudicated dependent after January 1, 1989, applied to them.

▮ On appeal, appellant argues that the juvenile court should instead have conducted a section 366.25 permanency planning hearing as to John and Sophia. Respondent contends that because a section 387 supplemental petition was sustained as to the two children in March 1989, they were adjudicated dependents after the effective date of the new law, and thus the later statutes apply.

As we noted above, the July 6, 1991, transcript appears to support appellant's argument that a mistake was made in the February-March 1991

hearing. It also appears that the juvenile court corrected it. Because the issue is likely to recur, however, we choose to exercise our discretion to resolve the issue even though the subsequent hearing would normally render it moot. (*In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr. 33, 473 P.2d 737]; *In re Taya C.* (1991) 2 Cal.App.4th 1, 6 [2 Cal.Rptr.2d 810].)

We agree with appellant that a section 387 supplemental petition does not result in a new adjudication of dependency, and that a juvenile court must base its procedure on the date a child's dependency is first adjudicated in determining whether pre- or post-January 1, 1989, statutes apply.

After they were adjudicated dependents in April 1988, John and Sophia were initially placed in the custody of their paternal grandmother. In July, however, when the grandmother could no longer care for them, John and Sophia were placed in foster care. In September 1988 at the six-month review hearing, respondent recommended and the juvenile court ordered that John and Sophia be returned to their father's custody, on condition he live with the children's paternal grandmother. In January 1989 father left the grandmother's home, and the children were returned to foster care. Respondent then filed a supplemental petition alleging that the "continuing trial return in the home of the minor[s'] father" had not been effective in protecting the children, that the paternal grandmother was unwilling or unable to continue caring for them, and therefore, "further placement planning is necessary." This is consistent with the language of section 387, which states "An order changing or modifying a previous order by removing a minor from the physical custody of a parent . . . and directing placement in a foster home . . . shall be made only after noticed hearing upon a supplemental petition. [¶] (a) The supplemental petition . . . shall contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the minor."

In other words, a section 387 petition equivalent is used where a child adjudicated dependent, who has been living with a relative, is later placed in out-of-home custody. Nowhere in the statute, or in the juvenile court rules (Cal. Rules of Court, former rule 1301 et seq.)[2] is there any indication that the effect of a true finding on a section 387 petition is equivalent to a new adjudication of dependency. Former rule 1391(b) (present rule 1430(c)) states that a supplemental petition should be used "(1) Whenever the petitioner concludes that a previous disposition has not been effective in the rehabilitation or protection of a minor adjudged . . . [a] dependent child of the court and seeks a more restrictive level of physical custody." Although not binding in the 1989 hearing on the supplemental petition, we also find

---

[2]All further rule references are to the California Rules of Court, unless otherwise noted.

further references to section 387 in the new juvenile court rules, effective January 1, 1990, instructive. Rule 1431(e)(1) and (2) require the hearing on a supplemental petition to be bifurcated into a jurisdiction phase, in which a determination is made on the allegations in the petition, and a disposition phase. In this phase, if the juvenile court determines that the child "is described by section 300[, subdivisions] (a), (d), or (e), the court shall remove the child from the physical custody of the parent or guardian."

Thus, if the juvenile court sustains a section 387 supplemental petition, the appropriate disposition is to move the child from parental to out-of-home custody. Unlike subsequent petitions (§§ 342, 360, subd. (a), & 364, subd. (e)), no new jurisdictional facts are alleged in a section 387 petition; no different or additional grounds for the dependency are urged. Section 387 petitions concern only changes in the level of placement for a child already adjudicated dependent.

This was clearly the case here; the problems which led to the initial adjudication of dependency did not change between April 1988 and April 1989, but the failure of the children's September 1988 placement with their father mandated that the appropriate placement level be changed back to foster care.

We thus conclude that for children adjudicated dependents of the juvenile court prior to January 1, 1989, an adjudication on a section 387 supplemental petition after this date does not make post-January 1, 1989, law afterwards applicable. These children must remain in the pre-1989 procedural track, with permanency planning hearings taking place under section 366.25, and termination of parental rights proceedings, if any, under Civil Code section 232.

Despite respondent's correction of the procedural problems related to John and Sophia's dependency, other issues raised by appellant may be raised in subsequent appeals, and we will therefore reach them.

B.  *Sufficiency of Evidence to Support Nonreturn*

In a section 366.22 hearing a juvenile court must "order the return of the minor to the physical custody of his or her parent or guardian unless, by a preponderance of the evidence, it finds that return of the child would create a substantial risk of detriment to the physical or emotional well-being of the minor." In a section 366.25 hearing, "the court shall first determine at the hearing whether the minor should be returned to his or her parent or guardian . . . ." ▇▇▇ John and Sophia were not returned to appellant's custody at

the February-March 1991 hearing, and she challenges the sufficiency of the evidence in support of this determination.

■ When an appellate court reviews a sufficiency of the evidence challenge, we may look only at whether there is any evidence, contradicted or uncontradicted, which would support the trier of fact's conclusion. We must resolve all conflicts in favor of the court's determination, and indulge all legitimate inferences to uphold the court's order. Additionally, we may not substitute our deductions for those of the trier of fact. (*In re Katrina C.* (1988) 201 Cal.App.3d 540, 547 [247 Cal.Rptr. 784]; *In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1132 [200 Cal.Rptr. 789].)

■ With this standard of review in mind, we will review the evidence in support of the court's determination that it would be detrimental to return the children to appellant's custody. At the time John and Sophia were adjudicated dependents, appellant was living with Steve, Jr., and Steve W. Steve W., as we have noted above, abused Steve, Jr., both physically and sexually, and extreme conflict existed between the parents, including threats of physical violence. By the time of the six-month review, although appellant was interested in having John and Sophia with her, her life was considered too unstable to place the children in her care.

This pattern of instability, which included no permanent housing, sporadic and frequently changing employment, inability to budget or allocate money, and inappropriate choices of living partners, persisted from the beginning of the children's dependency to the 18-month review. By that juncture, although the children enjoyed visits with appellant, she had made essentially no progress in resolving those problems which led to their out-of-home custody.

Appellant was evaluated by clinical psychologist Dr. Bruce Bess, who questioned whether appellant would ever be sufficiently self-reliant. Appellant's dysfunctional behavior, in his opinion, was likely to persist, and would prevent her from providing adequately for her children. Except for one brief period, appellant insisted that she did not need counseling, and refused to become engaged in therapy.

Appellant focuses on that aspect of Dr. Bess's report which identified an underlying psychological conflict in appellant, and suggested that this conflict had "contributed to a pattern of destructive, unstable relationships with men." She argues that this is mere speculation about her "future choice of abusive men" which cannot support nonreturn. We do not view this opinion in isolation, however. Dr. Bess's conclusions, together with evidence of

appellant's past conduct, her actions over the 18 months of John and Sophia's dependency, and her testimony at the 18-month hearing together formed the basis for the trial court's determination. We have no difficulty concluding, on this record, that substantial evidence supported the trial court's decision that it would be detrimental to return John and Sophia to appellant's custody.

### C.   *Adequacy of Reunification*

Appellant challenges both the adequacy of the reunification plan and of the reunification services provided her. In order to evaluate these arguments, we will review the history of reunification efforts in this case.

In April 1988 appellant first contacted respondent, expressing interest in reunifying with John and Sophia. She was referred by the case worker to a Methadone clinic for testing and a parenting program. She tested negative twice, but could not continue testing due to a conflicting work schedule.

After John and Sophia were placed at the children's shelter in July 1988, appellant again contacted the case worker, and visited the children several times in the shelter. No reunification service plan was prepared for appellant at the time of the six-month review, in September 1988, however. The minute order for this hearing requires respondent to provide family reunification, but this appears aimed at Paul V. and his new wife, who were about to resume custody of John and Sophia.

At the March 1, 1989, hearing on the section 387 supplemental petition, after the placement with their father had failed, appellant was ordered to obtain and maintain suitable housing, and to participate in individual or family therapy.

Appellant was then evaluated by Dr. Bess, whose report on the evaluation was dated June 16, 1989. We have already noted his conclusion that the problems underlying her inability to care adequately for her children were liable to persist.

At the continued disposition hearing as to Steve, in November 1989, which was held in conjunction with the 18-month review as to John and Sophia, the social worker recommended reunification efforts as to appellant to involve her in "counseling regarding personal and family issues as well as to continue employment and secure and maintain suitable housing." The juvenile court ordered appellant to complete a parenting class, to demonstrate her parenting skills in visitation with the children, to keep the social

worker apprised of her current address, to "participate in and complete a program of individual and family counseling approved by the social worker for the purpose of resolving the following specific issues: D[e]cision-making ability, self-reliance, and relationships with . . . her children;" that she participate in a psychological evaluation "to assess her general psychological functioning and ability to parent, . . . prior to consideration for reunification;" and that she obtain "suitable and adequate residence and accommodations for the minors."

Appellant was reevaluated by Dr. Bess in October 1990. He concluded there had been no improvement in her capacity to parent her children.

The report prepared for the February-March 1991 hearing notes that appellant was unwilling to engage in counseling until July 1990. In August, she was sent a list of counseling referrals. In September, when appellant was again having difficulty securing stable housing, she was given two referrals to agencies involved with housing assistance.

On this record, we cannot agree that either the reunification service plan, or services, were inadequate. Appellant raises several arguments in this regard. ■ She first challenges the fact that no reunification requirements were instituted for her until March 1989, almost a year after she first contacted respondent expressing interest in reunification. This was not error. At that time reunification services were being provided John and Sophia's father, from whose custody they had been removed, and to whom it was hoped the children could be returned. After a trial return failed in January 1989, however, appellant was considered for reunification. A reunification plan was ordered for her at the next review hearing, in March 1989. Services were provided her from this point until the February-March 1991 hearing, a period of almost two years, and substantially more than the eighteen-month maximum period delineated in the juvenile court law. (§ 366.22.)

■ Appellant next argues that the reunification service plan was inadequate per se, both because it ordered only generic "family reunification service" and because appellant's primary problem was her chronic low income. The record does not support these contentions. In June 1989, within three months of the March hearing, Dr. Bess's initial evaluation of appellant had been prepared. This evaluation was evidently ordered in an attempt to understand the causes of appellant's unstable lifestyle, and to tailor the service plan to her underlying needs. Thereafter, she was provided many referrals for housing, counseling on budgeting her income, and advice on her employment status.

Of more consequence, however, is the evidence that appellant's personality disorder, and not her problems with income or housing, was the true

cause of the problems which prevented appellant from adequately caring for her children.

Dr. Bess testified at the February-March 1991 hearing that his initial diagnosis of appellant as having a dependent personality disorder, meant that she had a "life-long pattern of never really being able to take responsibility for . . . herself." This pattern "tends to reoccur and . . . is maladaptive" and allowed others to take responsibility for decisions about appellant's life. This disorder, he testified, "interfered with [appellant's] ability to parent her children" because she would likely be in an unstable living situation, and tended to be involved in abusive relationships.

Dr. Bess testified that on reevaluating appellant a year later, he found that things had not changed for her. She had been unable to establish a stable lifestyle, support herself, or get involved in counseling, and she was presently unable to care for her children. In his opinion, the main problem causing instability in appellant's life was not income, but her interpersonal relationships. Although appellant's intentions with regard to her children were good, she had a problem establishing a home that met their needs. Even assuming she had adequate income, he would still be concerned with appellant's ability for setting limits, whether her interpersonal relationship problems would cause her life to become unstable and abusive towards the children, and the potential for role reversal; that the children would in fact assume a parental role in the family. In his opinion, this pattern was consistent and likely to continue. Although there was the possibility for some improvement, he was very concerned about appellant's responsibility toward her children. Appellant's inability to take initiative, in part, prevented her from caring for her children.

We reject appellant's suggestion that her chronic low income was the root cause of her inability to find housing. One social worker testified at the February-March 1991 hearing that in January 1989, respondent applied on appellant's behalf for housing assistance funds from critical family needs, and from nonrecurring needs under the AFDC (Aid to Families with Dependent Children) program. In February, respondent had in hand a check for housing assistance. Appellant was unable to secure housing, in spite of financial assistance, however, because of her poor payment history and her history of evictions. In April, appellant informed respondent that she had some tax liability, and couldn't consider renting an apartment at that point. Appellant then moved in with Steve W., and paid him $300 in rent, but a week later he threw her out, and she moved in with her brother and sister-in-law, despite the domestic violence in that household. She paid her sister-in-law $200 in rent, plus $200 for groceries. She also took a cab to her

place of employment. Appellant also received several referrals for housing assistance.

In early 1990, appellant was living in shared housing, but conflicts developed between appellant and the other tenants, who depended on appellant to care for their child. When appellant became ill and could not provide child care, she was asked to leave. Because appellant had been diagnosed as having a dependent personality, respondent attempted to support her in being more independent. One social worker testified he gave her information and his judgment on matters and would check back on her progress, but did not want to "do it for her." He also testified he spent an inordinate amount of time with appellant; 50 percent of his entire client contact was with her.

The juvenile court noted that many services had been provided to appellant over the previous two years, but questioned respondent on whether it should not have been more assertive in aiding appellant. Respondent noted that appellant was not only aware of the resources available to her, but in fact had been for some time; her contacts with a battered women's resource stretched back, appellant testified, to 1979. It also noted that appellant had consistently rejected the idea that she needed counseling, despite many referrals, and had only three weeks before the hearing finally engaged in therapy. It argued, we think correctly, that while lack of housing and income is a problem, "the main issue is providing the emotional stability that these children need and the safe environment free from people who abuse them either physically or sexually." Appellant's real problem, it argued, was appellant's lack of initiative to take advantage of the resources she was provided.

The juvenile court concluded, and we agree, that appellant was provided adequate reunification services. These services were extensive in nature, were tailored to the problems underlying the dependencies, and were provided from March 1989 to the February-March 1991 hearing, more than 18 months after Steve was adjudicated dependent. It is tragic that appellant's problems prevented successful reunification. The fault for this failure cannot be laid at respondent's feet, however.

D. *Applicability of the Indian Child Welfare Act*

■ Appellant's final assignment of error is that the Indian Child Welfare Act (25 U.S.C. § 1903 et seq.; the Act) may be applicable to the underlying dependency proceedings. She bases this allegation on the May 24, 1990, social worker's report, which noted that appellant "is of black, German and Creole Indian ethnic heritage. [Appellant] states that her mother had the

Creole Indian ethnic heritage, but that none of the family are enrolled on the Creole Indian Tribal Roles [*sic*]."

Appellant is correct that the Act applies to foster placement (25 U.S.C. § 1903(1).) The Act applies only to Indian children, however, defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) 53 Federal Register 52829, which defines the Indian Tribal Entities recognized by and eligible to receive funding from the United States Bureau of Indian Affairs (see 25 U.S.C. § 1903(8)) does not include a Creole Indian tribe among those listed. And as respondent suggests, the term "Creole" is not defined to include Native American tribal heritage. A brief perusal of the applicable law would have led any investigator of appellant's equivocal description to conclude, as we do, that on this basis the Act does not apply to her children.

### *Writ Petition No. H008929*

In her writ petition, which pertains only to Steve, Jr., appellant raises three issues: That it was impermissible for the juvenile court to hold a section 366.22, 18-month review rather than a section 366.21, 12-month review hearing; that reunification was inadequate; and that insufficient evidence supports the court's finding that reasonable services were offered her. Since the writ petition was filed only after appellant's parental rights were terminated in a subsequent section 366.26 hearing, however, we will dismiss the writ.

As appellant notes, the issues pertaining to orders made in section 366.21 and 366.22 hearings relating to Steve Jr., who was adjudicated dependent after January 1, 1989, are properly raised by writ petition and are not cognizable on appeal. (*In re Michelle M.* (1992) 4 Cal.App.4th 1024, 1031 [6 Cal.Rptr.2d 172] *In re Amanda B.* (1992) 3 Cal.App.4th 935, 941 [4 Cal.Rptr.2d 922]; § 366.26, subd. (k).)

Here, a petition for writ review of the section 366.22 hearing as to Steve, Jr., was filed on October 3, 1991, more than six months following the hearing, and, according to the petition, after appellant's parental rights to Steve, Jr., had been severed.

As we note in *Michelle M.* the legislative purpose behind providing writ review of the decisions made in a section 366.21 or 366.22 hearing is to allow an appellate court the opportunity to hear issues crucial to the decision

to move ahead with a permanent plan for a child who cannot be reunited with his or her parents prior to the time the subsequent hearing is held. (4 Cal.App. 4th at p. 1031.)

We announced in *Michelle M.* our intention to entertain "*only* writ review of termination of reunification issues in section 366.21 and 366.22 hearings, and to entertain that review only if it is requested in a timely fashion." (4 Cal.App.4th at p. 1031, italics in original.) Applications for writ review should be commenced sufficiently early to permit adjudication of issues raised in the petition before the section 366.26 selection and implementation hearing is commenced. (4 Cal.App.4th at p. 1031.) While we are aware that counsel for appellant did not have the benefit of decisional precedent when the March 1991 order was made, it makes neither legal nor practical sense for this court to review issues relating to section 366.21 or 366.22 hearings when her parental rights to Steve, Jr., have already been terminated, and when he may already be placed with a new family. Although we do not invoke the doctrine of laches here, we will dismiss the writ petition.

### Disposition

The order in appeal No. H008411 is affirmed. The writ petition, No. H008929, is dismissed.

Capaccioli, Acting P. J., and Premo, J., concurred.

A petition for a rehearing was denied May 15, 1992.